VENABLE LLP
Jean-Paul P. Cart (SBN 267516)
jpcart@venable.com
Harry Libarle (SBN 346020)
hlibarle@venable.com
101 California Street, Suite 3800
San Francisco, CA 94111
Telephone: 415.653.3750
Facsimile: 415.653.3755

*Attorneys for Defendant Federal National Mortgage Association, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MELVIN COLEMAN, an individual, on behalf of himself, the general public, and those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION, INC.,<br><br>Defendant. | Case No. 3:26-cv-05454-MMC<br><br>Hon. Maxine M. Chesney<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT**<br><br>Date: November 6, 2026<br>Time: 9:00 a.m.<br>Dept.: Courtroom 7 – 19th Floor<br><br>Filed Concurrently with:<br>1. Declaration of Jean-Paul P. Cart<br>2. Request for Judicial Notice<br>3. [Proposed] Order |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on November 6, 2026, at 9:00 a.m., or as soon thereafter as this matter may be heard, in the courtroom of the Honorable Maxine M. Chesney, located in Courtroom 7, 19th Floor, of the United States District Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Federal National Mortgage Association, Inc. will and hereby does move this Court to dismiss Plaintiff Melvin Coleman's Complaint in its entirety, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction and 12(b)(6) for failure to state a claim upon which relief can be granted. The basis for the requested relief regarding Rule 12(b)(1) is that Plaintiff's allegations, even if taken as true, fail to adequately satisfy the injury in fact requirement imposed by Article III of the United States Constitution. The basis for the requested relief regarding Rule 12(b)(6) is that Plaintiff's allegations, even if taken as true, fail to adequately plead the asserted claims as a matter of law.

This Motion is based on this Notice of Motion, the following Memorandum of Points and Authorities, the Declaration of Jean-Paul P. Cart (and all exhibits thereto), the Request for Judicial Notice filed concurrently herewith, the pleadings and other documents on file in this case, and all other arguments, evidence, and submissions as may be presented at oral argument of counsel.

Dated: August 24, 2026

VENABLE LLP

By: */s/ Jean-Paul P. Cart*
Jean-Paul P. Cart

*Attorneys for Defendant Federal National Mortgage Association, Inc.*

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

# TABLE OF CONTENTS

Page(s)

I. INTRODUCTION. ....1

II. STATEMENT OF THE CASE. ....2

A. Allegations Regarding Defendant's Business and Technology. ....2

B. Allegations Regarding Plaintiff's Involvement with Defendant. ....4

C. Plaintiff's Claims and Demands for Relief. ....6

III. PLAINTIFF LACKS ARTICLE III STANDING. ....8

IV. PLAINTIFF HAS FAILED TO PLEAD HIS CLAIMS. ....12

A. Plaintiff's California Constitution and Common Law Claims Fail as a Matter of Law. ....13

B. Plaintiff's Cal. Penal Code § 631 Claim Fails as a Matter of Law. ....16

C. Plaintiff's Cal. Penal Code § 638.51 Claim Fails as a Matter of Law. ....18

D. Plaintiff's Fraud Claim Fails as a Matter of Law. ....22

E. Plaintiff's Unjust Enrichment Claim Fails as a Matter of Law. ....24

V. CONCLUSION. ....24

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adams v. Johnson*,
355 F.3d 1179 (9th Cir. 2004) ....................12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................12, 14, 23

*Astiana v. Hain Celestial Grp., Inc.*,
783 F.3d 753 (9th Cir. 2015) ....................24

*Baiul-Farina v. Lemire*,
804 F. App’x 533 (9th Cir. 2020) ....................24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................12

*Belluomini v. CitiGroup, Inc.*,
2013 U.S. Dist. LEXIS 103882 (N.D. Cal. July 23, 2013)....................13

*Blue Wing Airlines Fin. v. Unical Aviation, Inc.*,
2023 U.S. Dist. LEXIS 40110, at *5 n.2 (C.D. Cal. Mar. 8, 2023) ....................24

*Briskin v. Shopify Inc.*,
2026 U.S. Dist. LEXIS 11317 (N.D. Cal. Jan. 21, 2026) ....................13

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ....................15

*Davis v. Facebook, Inc. (In re Facebook Inc. Internet Tracking Litig.)*,
956 F.3d 589 (9th Cir. 2020) ....................13

*de Ayora v. Inspire Brands, Inc.*,
2025 U.S. Dist. LEXIS 264583 (N.D. Cal. Dec. 22, 2025)....................13

*Esparza v. Kohl’s, Inc.*,
723 F. Supp. 3d 934 (S.D. Cal. 2024)....................14

*Fayer v. Vaughn*,
649 F.3d 1061 (9th Cir. 2011) ....................12

*Gabrielli v. Insider, Inc.*,
2025 U.S. Dist. LEXIS 28788 (S.D.N.Y. Feb. 18, 2025)....................10, 11

*Garcia v. Blackhawk Network, Inc.*,
2026 U.S. Dist. LEXIS 75154 (N.D. Cal. Apr. 1, 2026) ....................9

*In re Google Assistant Privacy Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ....................16

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) ....................20, 24

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) ....................14

*Harrill v. Emanuel Med. Ctr.*,
2025 U.S. Dist. LEXIS 109125 (E.D. Cal. June 9, 2025) ....................18

*Heeger v. Facebook, Inc.*,
509 F. Supp. 3d 1182 (N.D. Cal. 2020) ....................10, 14

*Hubbard v. Google LLC*,
2024 U.S. Dist. LEXIS 117876 (N.D. Cal. July 1, 2024) ....................14, 15

*I.C. v. Zynga, Inc.*,
600 F. Supp. 3d 1034 (N.D. Cal. 2022) ....................10

*Ji v. Naver Corp.*,
2022 U.S. Dist. LEXIS 179263 (N.D. Cal. Sept. 30, 2022) ....................10

*Karwowski v. Gen. Digit., Inc.*,
2025 U.S. App. LEXIS 28059 (9th Cir. Oct. 27, 2025) ....................17

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ....................12, 13

*Low v. LinkedIn Corp.*,
900 F. Supp. 2d 1010 (N.D. Cal. 2012) ....................14

*Maghoney v. Dotdash Meredith, Inc.*,
2026 U.S. Dist. LEXIS 36704 (S.D. Cal. Feb. 23, 2026) ....................9, 10

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008) ....................12

*Mastel v. Miniclip SA*,
549 F. Supp. 3d 1129 (E.D. Cal. 2021) ....................16

*Matera v. Google Inc.*,
2016 U.S. Dist. LEXIS 107918 (N.D. Cal. Aug. 12, 2016) ....................16

*Mikulsky v. Noom, Inc.*,
682 F. Supp. 855 (S.D. Cal. 2023) ....................9

*Miller v. Hearst Commc'ns., Inc.*,
2012 U.S. Dist. LEXIS 109121 (C.D. Cal. Aug. 3, 2012) ....................18

*Mitchener v. Talkspace Network LLC*,
2025 U.S. Dist. LEXIS 127525 (C.D. Cal. June 27, 2025) ....................9

*Ortiz v. Foris Dax, Inc.*,
2026 U.S. Dist. LEXIS 113330 (N.D. Cal. May 21, 2026) ....................22, 23

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ....................8, 9, 15, 18

*Revitch v. New Moosejaw, LLC*,
2019 U.S. Dist. LEXIS 186955 (N.D. Cal. Oct. 23, 2019)....................9, 15

*Rodriguez v. Brushfire Recs.*,
2025 U.S. Dist. LEXIS 264091 (C.D. Cal. Dec. 15, 2025) ....................10

*Rodriquez v. Autotrader.com, Inc.*,
762 F. Supp. 3d 921 (C.D. Cal. 2025) ....................9

*Saeedy v. Microsoft Corp.*,
2023 U.S. Dist. LEXIS 227915 (W.D. Wa. Dec. 21, 2023) ....................10

*Schallert v. Laird Superfood, Inc.*,
2026 U.S. Dist. LEXIS 126589 (C.D. Cal. June 5, 2026) ....................11

*Singer v. comScore Inc.*,
2026 U.S. Dist. LEXIS 146381 (C.D. Cal. June 30, 2026) ....................9, 14, 16, 19

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018)....................14

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)....................8

*Tash v. Vision Serv. Plan*,
2026 U.S. Dist. LEXIS 81761 (E.D. Cal. Apr. 14, 2026)....................9

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................8, 9

*Tsering v. Meta Platforms, Inc.*,
2026 U.S. Dist. LEXIS 113342 (N.D. Cal. May 21, 2026) ....................14, 19

*United States v. Christie*,
624 F.3d 558 (3d Cir. 2010)....................20

*United States v. New York Tel. Co.*,
434 U.S. 159 (1977)....................19

*Weisbuch v. Cnty. of Los Angeles*,
119 F.3d 778 (9th Cir. 1997) ....................12

*Wiley v. Universal Music Grp., Inc.*,
826 F. Supp. 3d 1121 (N.D. Cal. 2025) .......... 23

*Williams v. Facebook, Inc.*,
498 F. Supp. 3d 1189 (N.D. Cal. 2019) .......... 13

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) .......... 17

**California Cases**

*Aviles v. Liveramp, Inc*,
2025 Cal. Super. LEXIS 776 (Cal. Super. Ct. Jan. 28, 2025) .......... 20

*Blaker v. Netscout Systems, Inc.*,
No. 25STCV31283 (Los Angeles Super. Ct. May 27, 2026) .......... 20

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272 (2009) .......... 13

*Hill v. Nat'l Collegiate Athletic Ass'n*,
7 Cal. 4th 1 (1994) .......... 13

*Jogani v. Superior Court*,
165 Cal. App. 4th 901 (2008) .......... 24

*Lazar v. Superior Court*,
12 Cal. 4th 631 (1996) .......... 22

*Licea v. Hickory Farms LLC*,
2024 Cal. Super. LEXIS 66498 (Cal. Super. Ct. Mar. 13, 2024) .......... 20

*Sanchez v. Cars.Com, Inc.*,
2025 Cal. Super. LEXIS 710 (Cal. Super. Ct. Jan. 27, 2025) .......... 20

*Tavernetti v. Superior Court of San Diego Cty.*,
22 Cal. 3d 187 (1978) .......... 16

**California Statutes**

Cal. Civ. Code
§ 1709 .......... 22
§ 1710 .......... 15

Cal. Penal Code
§ 631 .......... *passim*
§ 637.2(a) .......... 18
§ 638.50 .......... 18, 19, 21
§ 638.51 .......... *passim*
§ 638.53 .......... 21

**Other Authorities**

Assemb. Comm. on Pub. Safety, Analysis of Assemb. B. 929, 2015–2016 Reg. Sess. (Cal. Apr. 7, 2015) ... 21

Assemb. Comm. on Privacy & Consumer Prot., Analysis of Assemb. B. 929, 2015–2016 Reg. Sess. (Cal. Apr. 21, 2015) ... 21

Fed. R. Civ. P. 8(a)(2) ... 14, 23, 24

Fed. R. Civ. P. 9(b) ... *passim*

Fed. R. Civ. P. 12(b)(1) ... 8

Fed. R. Civ. P. 12(b)(6) ... 12

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION.

Plaintiff Melvin Coleman's ("Plaintiff") Complaint alleges that Defendant Federal National Mortgage Association, Inc. ("Defendant") allowed a third party (*i.e.*, Microsoft) to obtain information related to his internet browsing activities because the cookie consent management tool on Defendant's website was ineffective. Plaintiff could have configured his web browser not to permit cookies, pixels, or other tracking technologies, among other simple options. He apparently did not do so. That choice notwithstanding, Plaintiff does not allege that he divulged, or that Defendant or Microsoft collected, any information that could be linked to his identity. Nor does he allege that his browsing and use of Defendant's website could have revealed information of even a remotely sensitive nature, much less that he could or would have sought to monetize such information. Plaintiff does not plausibly allege that Defendant acted intentionally or even recklessly, and nothing in the Complaint distinguishes Defendant's alleged conduct from standard and entirely expected commercial activities regarding internet use. The general fact pattern alleged in the Complaint (*i.e.*, the use of cookies, pixels, tags, and related technologies on commercial websites) is ubiquitous—that is how the internet works, and information regarding Plaintiff's browsing activities has surely been collected and shared with a wide range of entities numerous times per day, every day, since he filed the Complaint. The law is clear that Plaintiff has not been harmed in any way by Defendant's alleged conduct.

Plaintiff seeks to represent a class of all "persons who browsed [www.fanniemae.com] in the State of California after adjusting the toggle switches in the cookie consent preferences window to opt out of or reject all non-strictly necessary cookies." Based on allegations that he visited Defendant's website sometime in the last four years, interacted with an ineffective cookie consent preferences window that allowed Microsoft to collect information related to his browsing activities, and that Defendant and Microsoft could have used this information for targeted advertising and marketing purposes, Plaintiff asserts six causes of action for invasion of privacy, intrusion upon seclusion, violation of the wiretapping and pen register provisions of the California Invasion of Privacy Act ("CIPA"), common law fraud, and unjust enrichment.

All of Plaintiff's claims fail as a matter of law because he has failed to meet his burden of establishing injury in fact sufficient to establish Article III standing. Plaintiff's common law privacy claims fail as a matter of law because he had no reasonable expectation of privacy and because Defendant's alleged conduct was not highly offensive. As CIPA requires statutory standing based on a concrete injury, such claims fail for this reason, as well as for a variety of other reasons. Likewise, Plaintiff's common law fraud fails for want of particularity under Fed. R. Civ. P. 9(b), and for failure to plead intent, reliance, and damages. And lastly, unjust enrichment is not a cause of action. Accordingly, and for the reasons explained herein, the Complaint and each claim asserted therein should be dismissed.

## II. STATEMENT OF THE CASE.

### A. Allegations Regarding Defendant's Business and Technology.

Plaintiff asserts that Defendant "is a federally chartered corporation" that "participates in the secondary mortgage market by purchasing mortgage loans, securitizing mortgages, and providing liquidity to the housing finance system." (Compl. ¶¶ 8, 26.) Plaintiff further asserts that: "Defendant owns and operates [www.fanniemae.com], which allows visitors to . . . obtain information regarding mortgage financing, homeownership, mortgage assistance programs, loan products, and related housing resources." (*Id.* at ¶ 26.) Plaintiff's core allegation is that Defendant falsely represented that consumers could opt out of non-essential third-party cookies when browsing Defendant's website.

According to the Complaint, "[c]ookies are small text files sent by a website server to a user's web browser and stored locally on the user's device." (Compl. ¶ 21.) Plaintiff alleges that Defendant's website deploys both first-party cookies (placed by Defendant's web server) and third-party cookies (placed by third parties' web servers). (*Id.* at ¶ 21-23.) The Complaint does not take issue with Defendant's use of first-party cookies. With respect to third-party cookies, Plaintiff alleges that when a consumer visits Defendant's website, "the third parties' programming scripts . . . determine whether the third-party cookies are already stored on the user's device and . . . cause the user's browser to store those cookies on the device if they do not yet exist." (*Id.* at ¶ 23.) Plaintiff alleges that "[t]hird-party cookies include an identifier that

allows the third-party to recognize and differentiate individual users across websites (including [www.fanniemae.com]) and across multiple browsing sessions." (*Id.*) Plaintiff asserts that Defendant voluntarily enabled Microsoft's Clarity and LinkedIn cookies on its website. (*Id.* at ¶¶ 20, 27, 30.)

Plaintiff contends that when consumers first visit Defendant's website, Defendant displays a popup cookies consent banner that gives consumers the option to "Accept Cookies" or "Customize Settings." (Compl. ¶¶ 1, 31.) Plaintiff alleges that the "Customize Settings" link takes consumers to a cookies consent preferences window (*id.* at ¶ 32), which states that while "strictly necessary cookies" and "functional cookies" are always active, consumers can "reject all non-strictly necessary cookies, including all Analytics and Targeting cookies" by toggling them off. (*Id.* at ¶¶ 1-3, 29.) Plaintiff contends that "even after users adjust the available toggle switches to opt out of or reject all non-strictly necessary cookies," "Defendant causes third-party cookies to be transmitted to and from Website users' browsers and devices" (*id.* at ¶ 42), thereby deceiving consumers and allowing third parties, including Microsoft, "to surreptitiously track in real time and collect Website users' personal information." (*Id.* at ¶¶ 24, 34-36.) Plaintiff alleges this information includes "browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, device information, referring URLs, session information, user identifiers, and/or geolocation data." (*Id.*)

With respect to the Clarity cookie, Plaintiff alleges that: "Clarity allows Defendant to 'watch live users in action' via 'recordings of live user interactions' on the website, including a user's 'clicks or taps, scrolling, navigation, and more.'" (Compl. ¶ 43.) Plaintiff does not allege that Defendant has ever used such functionality within Clarity, much less in connection with his visit to Defendant's website. Plaintiff further alleges that "Clarity permits Defendant to aggregate individual users' session recordings into 'heatmaps'" that allow Defendant to "[s]ee at a glance which areas on [Defendant's website] drive the most engagement." (*Id.* at ¶ 44.) Again, Plaintiff frames this as a capability that Clarity *can* provide, not as something Defendant ever did, much less with respect to his visit to Defendant's website. Plaintiff contends that: "Clarity also permits Defendant to 'track a specific subset of users,' including tracking metrics like what

browser users visited from, what type of device, the date, and more." (*Id.*) He makes no allegation that Defendant tracked him specifically using this alleged functionality.

With respect to the LinkedIn cookie, Plaintiff alleges that the cookie allows LinkedIn to collect "information regarding users' devices, browsers, IP addresses, browsing activity, interactions with webpages, and advertising-related activity." (Compl. ¶ 49.) Plaintiff does not allege that Defendant has the ability to use any of the data allegedly collected by the LinkedIn cookie. Nor does he allege that Defendant's website contains any advertisements, such as banner ads that many businesses monetize (and use analytics and user information to generate additional revenue through). Rather, Plaintiff alleges that: "Microsoft analyzes and aggregates . . . user data across websites and time for their own purposes and financial gain, including, creating consumer profiles . . . creating audience segments . . . and performing targeted advertising and marketing analytics." (*Id.* at 5.) While Plaintiff vaguely alleges that Defendant "exploit[s]" and "monetizes" the data that Microsoft collects through Defendant's website for "profit" (*see id.* at ¶¶ 65-67), he provides absolutely no explanation for how Defendant—a federally chartered entity that operates within the secondary mortgage market—could, has, or would ever seek to monetize the limited browsing data of a single consumer like him (much less a consumer whose identity it is not even alleged to know). Nor does he grapple in any way with the fact that his allegations are fundamentally premised on what is alleged to be a technical error with respect to Defendant's cookies management tool.

**B. Allegations Regarding Plaintiff's Involvement with Defendant.**

Plaintiff is a resident of San Leandro, California. (Compl. ¶ 7.) Plaintiff alleges that he visited Defendant's website "while located in California, on one or more occasions during the last four years." (*Id.* at ¶ 71.) That is, he does not know if he visited Defendant's website once, or more than once. And all he can seemingly remember about *when* he visited Defendant's website is that it is—conveniently—within the longest statute of limitations period of any of the claims pleaded by his counsel.

Plaintiff claims the purpose of his visit (or visits, as he does not recall) was "to seek and obtain information about Fannie Mae's mortgage-related services, programs, and resources," and

in particular, "to research home-buying information, financing resources, and educational materials relating to homeownership and mortgage lending, including information intended to assist family members with housing-related decisions." (Compl. ¶ 71) Plaintiff alleges that he "reviewed informational content and videos available on the Website and navigated the Website by clicking links and entering search terms into the Website's search tools to locate information relevant to his interests and inquiries." (*Id.*) Plaintiff does not allege what he searched for. He does not allege that his browsing involved confidential or sensitive issues. He does not allege that he provided any personal information of any kind. And indeed, the generic and minimalist nature of these allegations is consistent with the litany of other nearly identical lawsuits filed by Plaintiff in recent months, reflecting that his lack of detail is intentional. (*See* Request for Judicial Notice ("RJN") at Exs. A at ¶¶ 84–92, B at ¶¶ 121–131, C at ¶¶ 81–91.)

Plaintiff alleges that upon visiting Defendant's website, he was presented with Defendant's popup cookie banner and consent preferences window. (Compl. ¶¶ 73-74.) He asserts that he then "adjusted the available toggle switches in the cookie consent preferences window to opt out of or reject all non-strictly necessary cookies, including Analytics and Targeting cookies," and selected "the 'Confirm My Choices' button to confirm these choices." (*Id.* at ¶ 75.) Plaintiff alleges that "only then" did he "continue browsing the Website." (*Id.* at ¶ 76.) Again, this is the same thing he has alleged, nearly word for word, in numerous other lawsuits in recent months, in similarly sparse detail. (*See* RJN Ex. A at ¶¶ 84–92, Ex. B at ¶¶ 121–131, Ex. C. at ¶¶ 81–91.)

Plaintiff alleges that "[e]ven before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for advertising and analytics, to be placed on Plaintiff's device and/or transmitted to Microsoft along with user data, without Plaintiff's knowledge." (Compl. ¶ 77.) Plaintiff contends that after he opted out of all non-strictly necessary cookies, Defendant "continued to cause" Microsoft to transmit cookies and data to and from his device, which allowed "Microsoft to track and collect Plaintiff's Private Communications as Plaintiff browsed the Website." (*Id.* at ¶ 78.) Plaintiff alleges that "[h]ad Defendant disclosed that it would continue to cause cookies and tracking

technologies to be stored on consumers' devices even after they choose to opt out of or reject all non-strictly necessary cookies, Plaintiff would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently." (*Id.* at ¶ 79.) Plaintiff does not describe *how* he would have interacted differently with the site—and again, does not allege that Defendant's website provides the ability to inquire into sensitive or highly personal issues, nor that it permits a visitor to input personal information.

Plaintiff alleges that while he "regularly visits websites that feature content similar to that of the Website," he "is not a consumer advocate, 'a tester,' or a compliance auditor," and "does not have the technical knowledge necessary to test whether the Website honors users' requests to opt out of or reject all non-strictly necessary cookies and tracking technologies." (Compl. ¶¶ 72, 80.) Again, he says the same thing in all of his other litigation matters, wherein he somehow nonetheless seems to have identified the issue, without pleading what "investigation" allegedly "revealed" the basis for his claims. (*See* RJN Ex. A at ¶¶ 84–92, Ex. B at ¶¶ 121–131, Ex. C. at ¶¶ 81–91.)

Plaintiff alleges that "[o]n or about October 9, 2025, Plaintiff notified Defendant that it was engaging in the conduct alleged herein," and that "[d]espite this notice, Defendant did not disclose this conduct to users." (Compl. ¶ 15.) Plaintiff argues that "[t]hese circumstances . . . warrant tolling of the statute of limitations." (*Id.* at ¶ 16.)

**C. Plaintiff's Claims and Demands for Relief.**

Plaintiff's First Cause of Action is a common law claim for invasion of privacy, premised on the California Constitution and the Fourth Amendment. He alleges that he has a legally protected privacy interest in—and a reasonable expectation of privacy to—his "Private Communications, including [his] browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, device information, referring URLs, session information, user identifiers, and/or geolocation data." (Compl. ¶ 92.) Plaintiff alleges he did not expect that after he "opted out of or rejected all non-strictly necessary cookies," Defendant would "permit Microsoft to store and send cookies" that "track and collect" these "[p]rivate [c]ommunications" while he browsed Defendant's website. (*Id.* at ¶¶ 92-93.) Plaintiff

further contends—in boilerplate terms—that Defendant's purported conduct "constitute[s] an egregious breach of social norms that is . . . . highly offensive to a reasonable person." (*Id.* at ¶¶ 95-96.)

Plaintiff's Second Cause of Action is for common law intrusion on seclusion. He alleges that he "had an objectively reasonable expectation of privacy surrounding [his] Private Communications on the Website based on Defendant's promise that users could opt out of or reject all non-strictly necessary cookies, including Analytics and Targeting cookies." (Compl. ¶ 105.) Plaintiff further alleges that Defendant's alleged conduct "would be highly offensive to a reasonable person given that . . . Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers opted out of or rejected all such cookies." (*Id.* at ¶ 106.) Plaintiff concludes without elaboration that Defendant's purported conduct "was intentional and intruded on Plaintiff's and users' Private Communications on the Website." (*Id.* at ¶ 107.)

Plaintiff's Third Cause of Action is for violation of Section 631(a) of CIPA, which essentially prohibits wiretapping. He alleges that "Defendant willfully aided, agreed with, employed, permitted, or otherwise caused Microsoft to wiretap Plaintiff and Class members using Microsoft's cookies." (Compl. ¶ 117.) Plaintiff further alleges that Microsoft's cookies and corresponding software "constitute 'machine[s], instrument[s], or contrivance[s]' under the CIPA," and that Microsoft "read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff . . . and Defendant . . . while the electronic communications were in transit" and "without the consent of all parties." (*Id.* at ¶¶ 114, 118.)

Plaintiff's Fourth Cause of Action is for violation of Section 638.51 of CIPA, which addresses use of a "pen register." He alleges that Microsoft's cookies and corresponding software are "pen registers" because they are devices or processes that capture "routing, addressing, or signaling information," including "IP addresses, port numbers, protocol-level metadata, HTTP request header metadata, and user-agent information [] from the electronic communications transmitted by Plaintiff's . . . devices." (Compl. ¶¶ 130-131.)

Plaintiff's Fifth Cause of Action is for common law fraud, deceit, or misrepresentation.

He alleges that "[b]y implementing the cookie banner, Defendant undertook responsibility for ensuring that the banner accurately communicated users' privacy choices and properly effectuated those choices." (Compl. ¶ 141.) Plaintiff further alleges that: "[o]n information and belief, Defendant operated, controlled, configured, approved, or maintained settings that permitted Microsoft's tracking technologies to continue collecting users' Private Communications even after users selected options indicating their choice to disable and/or reject non-strictly necessary cookies." (*Id.* at ¶ 142.) Plaintiff contends that: "[o]n information and belief, Defendant either knew its representations regarding users' ability to reject non-strictly necessary cookies . . . were false, lacked any reasonable basis for believing those representations were [true], [sic] or made those representations carelessly and recklessly despite information available to Defendant." (*Id.* at ¶ 146.) Plaintiff alleges in boilerplate terms that Defendant "intended to induce" him "to alter [his] position[] to [his] detriment," and claims that he has lost "money and/or property" and suffered "diminution of the value of [his] private and personally identifiable information and communications." (*Id.* at ¶¶ 149, 152.)

Finally, Plaintiff's unjust enrichment claim is premised on his allegation that Plaintiff "conferred an economic benefit on Defendant" and that "[i]t would be unjust for Defendant to retain the value of Plaintiff's . . . property and any profits earned thereon." (Compl. ¶¶ 159, 162.)

## III. PLAINTIFF LACKS ARTICLE III STANDING.

"For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). To establish Article III standing, a plaintiff must show: (1) that they "suffered an 'injury in fact' that is both 'concrete and particularized' and 'actual or imminent'"; (2) that the injury was likely caused by the defendant; and (3) that the injury would likely be redressed by judicial relief. *Popa v. Microsoft Corp.*, 153 F.4th 784, 788 (9th Cir. 2025) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Standing is a jurisdictional requirement, and thus a Rule 12(b)(1) motion is proper where a plaintiff cannot demonstrate standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

A statutory violation—standing alone—is insufficient to establish Article III standing, as

the obligation to demonstrate a "concrete" injury is constitutional in nature. *TransUnion*, 594 U.S. at 426. A "concrete" injury must be "'real, and not abstract,'" not merely "procedural." *Id*. at 424. "Traditional tangible harms," such as physical and monetary harms, are concrete injuries for Article III standing purposes. *Id*. at 425. The relevant inquiry under Article III in the privacy context is whether the alleged invasion was so "highly offensive" as to be actionable at common law. *Popa*, 153 F.4th at 791. But while privacy harms can in *some* instances establish Article III standing, naked or conclusory allegations of an invasion of privacy are insufficient. *See e.g.*, *Maghoney v. Dotdash Meredith, Inc*., 2026 U.S. Dist. LEXIS 36704 (S.D. Cal. Feb. 23, 2026); *Mitchener v. Talkspace Network LLC*, 2025 U.S. Dist. LEXIS 127525 (C.D. Cal. June 27, 2025). To establish standing, a plaintiff must "identify the 'specific personal information [they] disclosed that implicates a protectable privacy interest.'" *Mikulsky v. Noom, Inc.*, 682 F. Supp. 855, 864 (S.D. Cal. 2023); *see Popa*, 153 F.4th at 791 (finding standing lacking because the information conveyed was not "embarrassing, invasive, or otherwise private"); *Singer v. comScore Inc.*, 2026 U.S. Dist. LEXIS 146381, at *9 (C.D. Cal. June 30, 2026) (dismissing complaint for lack of standing because "[p]laintiffs have not plausibly alleged that any of their medical information collected by Defendants was connected to their personal identities"); *Rodriquez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921, 927 (C.D. Cal. 2025) ("Not all information will qualify; [it] must be sufficiently personal or sensitive that its disclosure is harmful."); *Garcia v. Blackhawk Network, Inc.*, 2026 U.S. Dist. LEXIS 75154, at *14 (N.D. Cal. Apr. 1, 2026) (finding that in light of *Popa*, tracking technologies "may result in highly offensive conduct" in *only* two ways: (1) "information collected could be especially sensitive," and (2) "the scope of the collection may be so broad, for example by tracking a Plaintiff's activity across other websites, that it renders the tracking highly offensive"); *Tash v. Vision Serv. Plan*, 2026 U.S. Dist. LEXIS 81761, at *13 (E.D. Cal. Apr. 14, 2026) ("Without describing the type of information contained in [plaintiff's] search parameters or how it was 'embarrassing, invasive, or otherwise private,' this allegation [of having performed searches] does not confer standing.").

California courts have "developed a presumption that [i]nternet communications do not reasonably give rise to" an expectation of privacy. *Revitch v. New Moosejaw, LLC*, 2019 U.S.

Dist. LEXIS 186955, at *7 (N.D. Cal. Oct. 23, 2019) (citing and collecting authorities). This is particularly true as to IP addresses, the collection of which "does not cause the kind of harm that can be vindicated in federal court." *Rodriguez v. Brushfire Recs.*, 2025 U.S. Dist. LEXIS 264091, at *20 (C.D. Cal. Dec. 15, 2025) (citing *Carolus v. Nexstar Media Inc.*, 2025 U.S. Dist. LEXIS 92707 (N.D. Cal. Apr. 9, 2025)); *see Maghoney*, 2026 U.S. Dist. LEXIS 36704, at *13. Indeed, "an IP address which cannot identify an individual user and at most conveys general geographic information does not justify [finding a concrete harm sufficient to establish standing]." *Gabrielli v. Insider, Inc.*, 2025 U.S. Dist. LEXIS 28788, at *14 (S.D.N.Y. Feb. 18, 2025); *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1189 (N.D. Cal. 2020) (lack of concrete injury because "[p]laintiffs do not plausibly allege anything more than the collection of IP addresses, and there is no legally protected privacy interest in IP addresses.").[1]

Here, Plaintiff alleges that he visited Defendant's website "on one or more occasions during the last four years" and "reviewed informational content and videos available on the Website and navigated the Website by clicking links and entering search terms into the Website's search tools to locate information relevant to his interests and inquiries." (Compl. ¶ 71.) Plaintiff admits that his interactions with Defendant's website were limited to "research[ing] . . . information intended to assist family members with housing-related decisions." (*Id.* at ¶ 71.) That is all the information that the Complaint provides regarding Plaintiff's interactions with Defendant's website. Plaintiff does not state that he had an account on Defendant's website, subscribed to Defendant's website, or did anything plausibly suggestive of Defendant or Microsoft having learned that he specifically—Melvin Coleman—had visited Defendant's website (an alleged fact he has since broadly publicized with no request to seal to protect his privacy). That is, he does not allege that Defendant, or in turn Microsoft, received information regarding his identity or contact information beyond basic browser signals such as IP address. (*See id.* at ¶¶ 71-72.) That is, while Plaintiff alleges that Defendant and Microsoft learned that a

[1] *See also Saeedy v. Microsoft Corp.*, 2023 U.S. Dist. LEXIS 227915 (W.D. Wa. Dec. 21, 2023); *Ji v. Naver Corp.*, 2022 U.S. Dist. LEXIS 179263 (N.D. Cal. Sept. 30, 2022); *I.C. v. Zynga, Inc.*, 600 F. Supp. 3d 1034, 1049 (N.D. Cal. 2022).

device associated with an *unknown user* went to Defendant's website, he does not allege that they ever learned *who* owned that device or was associated with it.[2] Moreover, while Plaintiff alleges certain *capabilities* of Microsoft's Clarity program, he does not allege in specific non-conclusory terms that data regarding *his* visit(s) to Defendant's website was used in this way. *Schallert v. Laird Superfood, Inc.*, 2026 U.S. Dist. LEXIS 126589, at *17 (C.D. Cal. June 5, 2026) ("Allegations about what the website *could* capture, as opposed to what it *did* capture from Plaintiff, are insufficient to confer standing.").

In the Complaint, Plaintiff makes no attempt to plead any injury in specific terms. He makes only the general boilerplate allegation that he has been harmed by "loss of value in [his] Private Communications, . . . damage to and loss of [his] . . . right to control the dissemination and use of [his] Private Communications, and . . . loss of [his] Private Communications . . . with no consent." (Compl. ¶ 123.) For several reasons, this does not satisfy his burden of demonstrating standing. Plaintiff does not plead that Defendant or Microsoft learned extensive information about his activities, as he alleges only that they learned information about his limited and <u>**anonymous**</u> visit to Defendant's website, during which he researched "information intended to assist family members." (*Id.* at ¶ 71.) Nor does Plaintiff plausibly allege: (1) that a market existed for the knowledge that he visited Defendant's website; or (2) that the market value of such information decreased because of Defendant's cookies practices. Indeed, Plaintiff's theory of harm is wholly illogical in light of the fact that Defendant *necessarily* learned his IP address and browsing activities on Defendant's website, as nothing in the Complaint alleges that Defendant was prohibited from using such information for commercial or any other purposes. There is no logical reason why Plaintiff would not have been harmed but-for the allegedly contemporaneous nature of the information sharing with Microsoft—demonstrating only that Plaintiff was not harmed at all.

---

[2] Note that while the Complaint states that geolocation information can be obtained from an IP address, it is well recognized that IP addresses only provide highly generalized location information. *Gabrielli*, 2025 U.S. Dist. LEXIS 28788 at *9-12. Plaintiff acknowledges that <u>every time</u> an internet user visits a website, the website's server receives a HTTP request that includes the user's IP address. (Compl. ¶ 17.)

While Plaintiff contends that the cookies consent manager on Defendant's website was ineffective, he completely ignores the fact that he could have configured his web browser not to permit cookies, pixels, or other tracking technologies from firing at all. Nor does he grapple with the fact (acknowledged in the Complaint) that most commercial websites fire a fleet of cookies immediately, without providing any cookies management options. (*See* Compl. at ¶ 2.)

For these reasons, Plaintiff has failed to establish standing as to any of his claims, though as discussed below, several of his claims also have statutory standing requirements that largely align with the relevant Article III analysis.

**IV. PLAINTIFF HAS FAILED TO PLEAD HIS CLAIMS.**

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For purposes of ruling on a Rule 12(b)(6) motion, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, the court is not required to "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004). Furthermore, "'a plaintiff may plead [them]self out of court'" if they "plea[d] facts which establish that [they] cannot prevail on [their] ... claim." *Weisbuch v. Cnty. of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997).

"[W]hen fraud is alleged, 'a party must state with particularity the circumstances constituting fraud . . . .'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting Fed. R. Civ. P. 9(b)). This means that the plaintiff must "articulate the who, what, when,

where, and how of the misconduct alleged." *Id.* at 1126. And where, as here, *all* of the claims are premised on the same allegedly deceptive or fraudulent conduct—and thus, "sound in fraud"—the entire complaint is subject to the heightened pleading standard of Rule 9(b). *See* de *Ayora v. Inspire Brands, Inc.*, 2025 U.S. Dist. LEXIS 264583, at *9 (N.D. Cal. Dec. 22, 2025) ("It is this alleged deception [a misconfigured cookies consent manager] which forms the backbone for all of Plaintiffs' claims, and therefore the Court finds that the nature of the averred conduct sounds in fraud. Plaintiffs' claims are subject to Rule 9(b)."); *Williams v. Facebook, Inc.*, 498 F. Supp. 3d 1189, 1200-01 (N.D. Cal. 2019) (applying Rule 9(b) to common law privacy claims sounding in fraud).

**A. Plaintiff's California Constitution and Common Law Claims Fail as a Matter of Law.**

The elements of a claim for invasion of privacy under the California Constitution are: "(1) [The plaintiff] possess[es] a legally protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) the intrusion is 'so serious . . . as to constitute an egregious breach of social norms' such that the breach is 'highly offensive.'" *Davis v. Facebook, Inc. (In re Facebook Inc. Internet Tracking Litig.)*, 956 F.3d 589, 601 (9th Cir. 2020) (quoting *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009)); *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 35–37 (1994). "Whether a legally recognized privacy interest is present in a given case is a question of law to be decided by the court." *Hill*, 7 Cal. 4th at 40. The elements of intrusion upon seclusion are: (1) a defendant "intentionally intrude[d] into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy," and (2) that the intrusion was "highly offensive" to a reasonable person. *Hernandez*, 47 Cal. 4th at 286. For both claims, the defendant's violation of the plaintiff's rights must be intentional. *See Briskin v. Shopify Inc.*, 2026 U.S. Dist. LEXIS 11317 at *13–15 (N.D. Cal. Jan. 21, 2026). In light of this similarity, courts regularly consider these claims collectively. *See id.*; *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d at 605.

California law establishes a "high bar for an invasion of privacy claim." *Belluomini v. CitiGroup, Inc.*, 2013 U.S. Dist. LEXIS 103882, at *20 (N.D. Cal. July 23, 2013). "[D]ata

collection and disclosure to third parties that is 'routine commercial behavior' is not a 'highly offensive' intrusion of privacy." *Tsering*, 2026 U.S. Dist. LEXIS 5762 at *22-23 (citing *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090 (N.D. Cal. 2022), *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012) (dismissing intrusion on seclusion claim regarding receipt of browsing history and data)); *see also Heeger*, 509 F. Supp. 3d at 1189 (finding no legally protected privacy interest in IP addresses). "Contemporary internet browsing involves the collection of users' data, including by tracking users across the internet, *and a reasonable user should expect as much*." *Hubbard*, 2024 U.S. Dist. LEXIS 117876 at *22; *Esparza v. Kohl's, Inc.*, 723 F. Supp. 3d 934, 945–46 (S.D. Cal. 2024) (browser history is not sensitive, personally identifiable information). And to be clear, searches on publicly available websites are not so sensitive as to give rise to an invasion of privacy claim. *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) ("We do not agree that the collected data is so different or sensitive. The data show only that Plaintiffs searched and viewed publicly available health information that cannot, in and of itself, reveal details of an individual's health status or medical history."); *see Singer*, 2026 U.S. Dist. LEXIS 146381, at *6–7 (finding that collection of information unconnected to personal identities "does not rise to the 'highly offensive' interference or disclosure required by the common-law privacy torts of intrusion upon seclusion and public disclosure of private facts.").

In light of these authorities, Plaintiff's claims fail for multiple reasons. First, as explained above, he has not plausibly alleged that Defendant *intentionally* violated Plaintiff's privacy interests. *See Tsering*, 2026 U.S. Dist. LEXIS 113342, at *2 (dismissing invasion of privacy claim for failure to plausibly allege that the defendant knew "its access and use of data was without users' permission"). Here, Plaintiff alleges that Defendant engaged in fraud. (*See* Compl. ¶¶ 91, 137-155.) Although Rule 9(b) permits intent, knowledge, and other conditions of mind to be alleged somewhat generally, a plaintiff must still plead sufficient nonconclusory facts to make the defendant's alleged state of mind plausible under Rule 8. *Ashcroft*, 556 U.S. at 686–87 (2009). Thus, a bare assertion that the defendant "knew" a representation was false, "intended" to deceive, or acted "recklessly," without factual allegations supporting a reasonable inference of

that mental state, does not suffice. (Compl. ¶¶ 107, 146, 152.) In particular, California Civil Code section 1710 defines "deceit" in relevant part as: "[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." Cal. Civ. Code § 1710. Here, Plaintiff does not allege any facts suggesting that Defendant knowingly made any false statements on its website, versus the entirely plausible inference that its website was merely experiencing a technical issue with its cookies configuration manager. Furthermore, the fact that Plaintiff filed three nearly identical lawsuits in a three-month span indicates that cookie configuration issues are not uncommon—and indeed, plausibly suggest that he searches for them. (*See* RJN Ex. A at ¶¶ 84–92, Ex. B at ¶¶ 121–131, Ex. C. at ¶¶ 81–91.) "When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (citing *Iqbal*, 556 U.S. at 678). Nothing in the Complaint reflects anything other than that Defendant's cookies consent manager experienced a brief technical malfunction unbeknownst to Defendant. Accordingly, Plaintiff does not plausibly allege intent.

Second, courts have held that users ordinarily lack a reasonable expectation of privacy in routine internet-routing and browsing information disclosed as part of ordinary website operation. *See Revitch v. New Moosejaw, LLC*, 2019 U.S. Dist. LEXIS 186955, at *7 (N.D. Cal. Oct. 23, 2019); *Hubbard v. Google LLC*, 2024 U.S. Dist. LEXIS 117876, at *21–26 (N.D. Cal. July 1, 2024). The fact that Plaintiff was browsing a free informational website that he did not have an account with and did not subscribe to, and chose not to configure his web browser not to permit cookies, underscores that he did not have a reasonable expectation of privacy in his routine browsing activities on a single website.

Third, Defendant and Microsoft's alleged receipt of the limited categories of **<u>anonymous</u>** information (*i.e.*, information unconnected to Plaintiff's actual identity) alleged in the Complaint does not implicate a "sensitive sphere" sufficient to meet the "highly offensive" standard under the common law. *See Popa*, 153 F.4th at 791 (finding that Microsoft's conduct was not "highly

offensive" because it did not rise to the level of hypotheticals provided in the Restatement, wherein "A . . . rents a room in a house adjoining B's residence, and for two weeks looks into the windows of B's upstairs bedroom through a telescope taking intimate pictures with a telescopic lens," and "A publishes, without B's consent, a picture of B nursing her child.") (quoting Restatement (Second) of Torts §§ 652B cmt. b, illus. 2, 652D cmt. c, illus. 10); *Singer*, 2026 U.S. Dist. LEXIS 146381, at *8 ("We thus ultimately agree with the other district courts that have found that the type of tracking seen in our case—relating to browsing activity not connected to personally identifiable information—is not intrusive enough . . . ."). Plaintiff alleges only that he reviewed informational content and videos, clicked links, and entered unspecified search terms to locate information relevant to his interests and inquiries. (Compl. ¶ 71.) That is not enough for an invasion of privacy under California law, particularly where the "interests and inquiries" that could be served by Defendant's website are narrow and non-sensitive.

### B. Plaintiff's Cal. Penal Code § 631 Claim Fails as a Matter of Law.

Section 631(a) of the California Penal Code consists of three main clauses which cover "three distinct and mutually independent patterns of conduct:" (1) "intentional wiretapping;" (2) "willfully attempting to learn the contents or meaning of a communication in transit over a wire;" and (3) "attempting to use or communicate information obtained as a result of engaging in either of the previous two activities." *Tavernetti v. Superior Court of San Diego Cty.*, 22 Cal. 3d 187, 192 (1978). The fourth basis for liability under Section 631(a) is for aiding and abetting any person or persons who "unlawfully do, or permit, or cause to be done any of the other three bases for liability." *Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1134 (E.D. Cal. 2021). Here, because all three theories of direct liability fail, Plaintiff's claim based on the aiding and abetting clause of Section 631(a) also fails.

The first clause of Section 631(a), for "intentional wiretapping," applies only to "telegraph or telephone" communications over a wire. *See, e.g., In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 825 (N.D. Cal. 2020) ("Beginning the first clause of § 631(a), Defendants are correct that it protects only communications that are made over a 'wire, line, or cable.' This is evident from the plain text of the statute []."); *Matera v. Google Inc.*, 2016 U.S.

Dist. LEXIS 107918, at *57 (N.D. Cal. Aug. 12, 2016) ("[T]he first clause" [] is "limited to communications passing over 'telegraph or telephone' wires, lines, or cables."). As such, because Plaintiff's Complaint challenges only internet/website activity, Plaintiff cannot state a claim under subdivision (a).

The second clause of Section 631(a), for willfully attempting to learn the contents of a communication in transit over a wire, fails as well. First, as the website operator, Fannie Mae is a party to the users' communications with its own site and cannot be directly liable for wiretapping its own communications. *Karwowski v. Gen. Digit., Inc.*, 2025 U.S. App. LEXIS 28059, at *2–3 (9th Cir. Oct. 27, 2025). Second, Plaintiff does not allege that Microsoft obtained the contents of his communications to www.fanniemae.com while those communications were "in transit" to Defendant. Instead, he alleges that the Clarity and LinkedIn cookies caused his browser to send information directly to Microsoft. (Compl. at ¶ 122 ("Microsoft . . . routed Plaintiff's and Class members' electronic communications to Microsoft's servers. . . . [Plaintiff's] California-based device . . . executed the code, causing the transmission of data (including cookie data) to and from Microsoft.").) Indeed, the Complaint contains images reflecting what could only be described as direct connections with LinkedIn and Clarity. (*See e.g., id.* at ¶¶ 37, 46.) While paragraphs 53 to 60 of the Complaint describe *why* Microsoft allegedly reviews data from users' browsers as soon as it receives it, these paragraphs do not overcome the contrary allegation in the Complaint that data goes directly from Plaintiff to Microsoft. This is fundamentally distinct from what Section 631 prohibits, as Plaintiff alleges that Microsoft received an entirely separate electronic signal versus what Plaintiff's browser sent to the server of Defendant's website. Moreover, the information that Plaintiff alleges Defendant received is mere record information, and not the "contents" of a communication. *See Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1082–83 (C.D. Cal. 2021) (browsing data such as "keystrokes, mouse clicks, pages viewed, . . . the duration of the visit, Plaintiff's IP address, . . . browser type, and the operating system" are not the substantive "contents" of a communication). While Plaintiff vaguely claims he "enter[ed] search terms into the Website's search tools" and "reviewed informational content and videos," he does not provide examples of actual searches he allegedly performed, nor does

he specifically allege and any such terms were transmitted to Microsoft, rendering his allegations deficient. (Compl. at ¶ 71); *see Harrill v. Emanuel Med. Ctr.*, 2025 U.S. Dist. LEXIS 109125 at *27 (E.D. Cal. June 9, 2025) (holding "Plaintiff's allegations [in]sufficient to plead the 'contents' of her communications" where she "d[id] not specify or describe the searches").

The third clause of Section 631(a) is dependent upon a violation of the first or second clauses, and because Plaintiff has failed to plead a claim under the first or second prong of Section 631(a), his claim under the third prong necessarily fails. Similarly, the fourth clause for aiding and abetting depends on a predicate violation of the first three clauses, so it falls as well, and also because Plaintiff has failed to plead that *Microsoft*, the alleged direct violator of Section 631, had any knowledge that Plaintiff had not consented to the alleged information sharing vis-à-vis Microsoft third-party cookies.

Additionally, Plaintiff lacks statutory standing. Only persons who have been "injured" by a CIPA violation have standing to sue. *See* Cal. Penal Code § 637.2(a) ("Any person ***who has been injured*** by a violation of this chapter may bring an action against the person who committed the violation.") (emphasis added). That is, regardless of CIPA's statutory damages provision, Plaintiff must allege not only a violation, but *also* that the violation resulted in concrete injury to him. *See Miller v. Hearst Commc'ns., Inc.*, 2012 U.S. Dist. LEXIS 109121 at *19–20 (C.D. Cal. Aug. 3, 2012) ("Because Plaintiff fails to allege a cognizable injury, she lacks statutory standing for her . . . claim, regardless of whether her allegations are sufficient to state a violation of the . . . law."). Plaintiff makes no attempt to make the requisite showing vis-à-vis Section 631, and his claim necessarily fails.

### C. Plaintiff's Cal. Penal Code § 638.51 Claim Fails as a Matter of Law.

California law prohibits the installation of a pen register without obtaining a court order or consent. Cal. Penal Code § 638.51. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b). Plaintiff contends that Microsoft's cookies and corresponding software constitute "pen registers" because they record addressing or signaling

information, including "IP addresses, port numbers, protocol-level metadata, HTTP request header metadata, and user-agent information." (Compl. at ¶ 131.) The claim fails for several independent reasons.

First, Plaintiff lacks statutory standing to pursue a Section 638.51 claim for the same reasons his Section 631 claim fails as a matter of law. Yet his lack of statutory standing is even clearer in the context of Section 638.51 because, as explained below, collection or sharing of IP addresses falls outside the scope of the privacy interests Section 638.51 seeks to protect, and because Plaintiff had no reasonable expectation of privacy in this regard. Indeed, Plaintiff does not allege that his data has been deanonymized, or that Defendant or Microsoft discovered or marketed his actual identity. *See Singer*, 2026 U.S. Dist. LEXIS 146381, at *9 (dismissing complaint because "Plaintiffs have not plausibly alleged that any of their medical information collected by Defendants was connected to their personal identities").

Second, Plaintiff's allegations "do not support a plausible inference that the geolocation data and IP addresses [Microsoft is] alleged to have intercepted constitute 'dialing, routing, addressing, or signaling information' rather than the 'contents' of the communications at issue." *Tsering v. Meta Platforms, Inc.*, 2026 U.S. Dist. LEXIS 113342, at *5 (N.D. Cal. May 21, 2026) (quoting Cal. Penal Code § 638.50(b)). Put differently, while Plaintiff alleges that Microsoft's cookies "collect information regarding users' devices, browsers, IP addresses, browsing activity, interactions with webpages, and advertising-related activity," (Compl. at ¶ 49), he does not allege that the IP addresses were actually used in this instance as routing information, or plausibly allege that they were in any way separate from the "contents of [the] communication[s]" themselves, as the statute requires. Cal. Penal Code § 638.50(b).

Third, while it is true that the language of Section 638.51 is broad, Plaintiff's expansive definition of a "pen register" takes the statute far beyond its breaking point. *See United States v. New York Tel. Co.*, 434 U.S. 159, 161 n.1 (1977) ("A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released."). Although some district courts have defined "pen register" to

include website cookies/pixels,[3] California state courts have largely rejected Plaintiff's position. In *Aviles v. Liveramp, Inc.*, the court explained that courts have historically acknowledged that "[a] pen register . . . records the numbers dialed from a telephone." 2025 Cal. Super. LEXIS 776 at *5 (Cal. Super. Ct. Jan. 28, 2025). "The analog of the number dialed by a telephone here is the IP address and related information of a *website* accessed by a computer—but not the computer's own IP address or identifying information." *Id.* (noting that "the category of information collected by pen registers as defined by the statute has [not] been expanded"). In *Aviles*, as here, the plaintiff alleged that defendants collected the IP address of the website visitor (*i.e.*, the plaintiff). The "problem with this argument is that it is normal for websites to track the IP addresses of their visitors." *Aviles*, 2025 Cal. Super. LEXIS 776 at *6. "Without alleging that Defendant installed software on *Plaintiff's* device or browser that collected incoming contact information to *Plaintiff's* device, Plaintiff has not alleged anything above and beyond how the internet normally works." *Id.* at *7 (dismissing Section 638.51 claim); *see United States v. Christie*, 624 F.3d 558, 563 (3d Cir. 2010) ("IP addresses are . . . conveyed to websites that an internet user visits, and administrators of websites . . . can see the IP addresses of visitors to their sites. However, site administrators do not possess information linking a given IP address to a particular person."); *see also*, *Licea v. Hickory Farms LLC*, 2024 Cal. Super. LEXIS 66498 at *10 (Cal. Super. Ct. Mar. 13, 2024) (finding "public policy strongly disputes Plaintiff's potential interpretation of privacy laws as one rendering every single entity voluntarily visited by a potential plaintiff, thereby providing [the user's] IP address for purposes of connecting the website, as a violator"); *Sanchez v. Cars.Com, Inc.*, 2025 Cal. Super. LEXIS 710 at *8 (Cal. Super. Ct. Jan. 27, 2025) (cookie that collected device information outside the definition of a "pen register" under CIPA); *Blaker v. Netscout Systems, Inc.*, No. 25STCV31283 (Los Angeles Super. Ct. May 27, 2026) (*see* RJN Ex. D) ("[A]pplying the ordinary rules of statutory construction and considering both the structural context of Penal Code section 638.51 and the

---

[3] *See e.g. Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

legislative history, the Court concludes that this statute applies to telephonic communications and not to software on a commercial website.”).

Plaintiff’s desired construction of the pen register statute is ill-conceived and, if adopted, would destroy the online advertising ecosystem and prevent website operators from monitoring the functioning, accessibility, and appeal of their websites. Nothing in the text of the statute reflects any intent by the Legislature to impose such an absurd result, particularly because the Legislature has recently made its privacy views clear vis-à-vis the California Consumer Privacy Act (“CCPA”) and other legislative activities. To the contrary, the legislative history of CIPA’s various pen register provisions reflects that the Legislature intended for the statute the apply only to telephones. Assembly Bill 929 established Cal. Penal Code §§ 638.50-638.53 in 2015, and “authorize[d] state and local law enforcement to seek emergency orders for pen registers/trap and trace devices used in telephone surveillance.” (*See* RJN Ex. F at 3.) Several passages within the legislative history of this bill reflect that the Legislature has consistently understood a pen register to pertain only to telephones:

- “One of the tools available to law enforcement is called a ‘pen register’ which allows law enforcement officers to record all outgoing numbers from a particular telephone line. In addition, another tool law enforcement uses is called a ‘trap and trace device’ which allows them to record what numbers have called a specific telephone line, i.e. all incoming phone numbers.” (RJN Ex. E at 5–6.)
- “Pen registers and track [sic] and trace devices track incoming and outgoing telephone calls.” (*Id*. at 6.)
- “The amendments also clarify that any location information obtained by a pen register or a track [sic] and trace device is limited to the information that is contained in the telephone number (e.g. the area code).” (*Id*.)
- “Authorizes state and local law enforcement agencies to seek an emergency order to use pen registers and trap and trace devices in telephone surveillance if there is probable cause to believe that their use will lead to evidence of a crime.” (RJN Ex. F at 1.)

- "As noted above, pen registers/trap and trace devices are used by law enforcement for telephone surveillance to record incoming and outgoing phone numbers from a tapped line." (*Id*. at 3.)

In contrast, nothing in the legislative history reflects any legislative recognition or belief that Penal Code § 638.51 could apply in the situation presented here. Thus, Plaintiff's claim fails as a matter of law.

**D. Plaintiff's Fraud Claim Fails as a Matter of Law.**

"The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996) (quoting 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 676, p. 778); *see also* Civ. Code, § 1709 ("One who *willfully* deceives another with *intent* to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.") (emphasis added).

"Fraud claims must satisfy the Rule 9(b) pleading standard." *Ortiz v. Foris Dax, Inc.*, 2026 U.S. Dist. LEXIS 113330, at *23 (N.D. Cal. May 21, 2026). "Rule 9(b) requires that 'the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'" *Id.* (quoting *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009)). "This typically takes the form of providing the 'who, what, when, where, and how of the misconduct alleged.'" *Id.* (quoting *Kearns*, 567 F.3d at 1126).

Here, Plaintiff fails to plead his fraud claim with the specificity that Fed. R. Civ. P. 9(b) requires. First, Plaintiff does not identify when he visited www.fanniemae.com beyond alleging one or more visits "during the last four years." (Compl. ¶ 71.) This vague allegation is insufficient under Rule 9(b)—particularly where he alleges a technical error with respect to Defendant's website and does not allege that such error was in effect beyond the narrow time period in which his counsel purportedly documented the functioning of Defendant's website. *See Ortiz*, 2026 U.S. Dist. LEXIS 113330, at *24 ("Four years is a broad enough span of time that

Defendant's website — including its popups and cookie practices — may have been materially different at different times. Without a more specific timeframe, Defendant lacks the knowledge it needs to defend itself against the claim . . . ."); *Wiley v. Universal Music Grp., Inc.*, 826 F. Supp. 3d 1121, 1138 (N.D. Cal. 2025). Second, and equally problematic, Plaintiff does not identify the particular pages, videos, links, or search terms involved in his interactions with the website. *See Ortiz*, 2026 U.S. Dist. LEXIS 113330, at *24) ("It might be a different case if Plaintiffs alleged that they submitted personally identifying information . . . . [b]ut . . . . [t]hey allege only that they 'browsed.' Plaintiffs' allegations as pled do not satisfy Rule 9(b)'s notice with particularity standard.") Nor does he identify the particular cookies or transmissions associated with *his own* visits to Defendant's website, or how he became aware that analytics and targeting cookies allegedly continued to operate after his opt-out selection. (*See* Compl. ¶¶ 14, 71, 76.) Plaintiff thus fails to plead the circumstances of the alleged fraud with requisite particularity.

Plaintiff's fraud cause of action also lacks "facial plausibility" under Fed. R. Civ. P. 8(a)(2). *See Ashcroft*, 556 U.S. at 663 ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Even assuming Plaintiff adequately pleaded the first element (misrepresentation), as explained in Section IV.A, *supra*, nothing in the Complaint suggests any intent to deceive by Defendant, nor Defendant's purported knowledge of any inconsistencies in the configuration of its cookies consent manager. Accordingly, Plaintiff fails to establish the second element (scienter) and third element (intent to defraud). Plaintiff also fails to establish the fourth element (justifiable reliance), as while he claims that "he would have interacted with the Website differently" had he known analytics and targeting cookies were continuing to fire (Compl. ¶ 79), he makes no attempt to explain what that different interaction would have looked like. Plaintiff's admission that he would have continued to use Defendant's website even after learning that analytics and targeting cookies were continuing to fire, coupled with the fact that he could have configured his web browser not to permit cookies (but apparently did not), proves that he did not justifiably rely on any statements made by Defendant's cookies consent manager. Finally, as explained in Section III, *supra*, Plaintiff does not identify any legally cognizable harm

caused by his alleged reliance, nor that Fannie Mae or any third party linked the collected information to his name or contact information. For these reasons, Plaintiff fails to plead the fifth element (resulting damage).

Plaintiff fails to describe the circumstances of the alleged fraud with specificity as required by Rule 9(b) and plausibly establish the elements of fraud as required by Rule 8(a)(2). Accordingly, his fraud claims fails as a matter of law.

### E. Plaintiff's Unjust Enrichment Claim Fails as a Matter of Law.

The Ninth Circuit and California state courts have consistently held that "in California, there is not a standalone cause of action for 'unjust enrichment[.]'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (citing *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010)); *Baiul-Farina v. Lemire*, 804 F. App'x 533, 537 (9th Cir. 2020) ("'[U]njust enrichment is not a cause of action' under California law") (quoting *McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004)); *Jogani v. Superior Court*, 165 Cal. App. 4th 901, 911 (2008) ("As [Plaintiff] concedes, however, unjust enrichment is not a cause of action.").

The Court here should follow "the more widely accepted principle that there is no separate cause of action for unjust enrichment," *Blue Wing Airlines Fin. v. Unical Aviation, Inc.*, 2023 U.S. Dist. LEXIS 40110, at *5 n.2 (C.D. Cal. Mar. 8, 2023), and dismiss Plaintiff's unjust enrichment claim. *See Greenley*, 684 F. Supp. 3d at 1055 (granting motion to dismiss "with respect to Plaintiff's unjust enrichment claim" because "Plaintiff's final cause of action is for 'unjust enrichment,' which is not a standalone cause of action.").

## V. CONCLUSION.

For the foregoing reasons, Defendant respectfully requests that the Court dismiss the Complaint in full and without leave to amend.

Dated: August 24, 2026

VENABLE LLP

By: */s/ Jean-Paul P. Cart*
Jean-Paul P. Cart

*Attorneys for Defendant Federal National Mortgage Association, Inc.*